UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| SCOTT TRAUDT | > | |
| PLANTIFF | > | |
| | > | |
| Vs. | > | Civil Action, File No. 1:04-CV-53 |
| | > | |
| DAIMLERCHRYSLER | > | |
| MOTORS COMPANY LLC, | > | |
| PERFORMANCE MARKETING, | > | |
| INC., | > | |
| DAVID CICOTTE, | > | |
| MECHANICS JOHN DOES 1-4 | > | |

### FIRST AMENDED COMPLAINT

This suit is brought to force Daimler-Chrysler Motors, Inc., to recall defective vehicles marketed in North America as "Dodge Dakota" and "Dodge Durango" due to horrendous defects in their front suspension systems posing an omnipresent, immediate threat to the safety of occupants and other motorists. Relief is sought in the form of an order of this court ordering Daimler-Chrysler to recall, *inter alia* at Daimler-Chrysler expense, Dakota and Durango vehicles and effect immediate, compulsory repairs using parts and/or implementing production modifications that meet ISO 9001 standards for quality, safety, and reliability. Performance Marketing, Inc., and David Cicotte are sued under various causes of action, but most particularly under the Racketeer Influenced Corrupt Organization Act (commonly referred to as RICO: 18 USCS 1961, 1962 (b) (c), 1964 (c), and 1961 (5) ) in that they have operated and continue to operate a racketeering enterprise, derive substantial financial benefit from this racketeering enterprise, have conducted criminal marketing practices and criminally negligent, fraudulent automotive repairs. Traudt also brings this action pursuant to 18 USCS 4 (Misprision of a felony)

### PLAINTIFF

1. Plaintiff Scott Traudt (hereinafter, "Traudt") is a resident of Strafford, Vermont, and the owner of a defective 2003 year production Dodge Dakota Club Cab model variant currently possessing a defective suspension system, electrical system, brake system, and fuel system. And the radio doesn't work, either.

### DEFENDANTS

2. Defendant DaimlerChrysler Motors LLC (hereinafter, "Daimler") is an Auburn, Michigan transnational corporation. Daimler actively markets Dodge Dakotas (hereinafter, "Dakota") and Dodge Durangoes (hereinafter, "Durango") throughout North America, including Vermont.

3. Defendant Performance Marketing, Inc. (hereinafter, "Performance") is a Vermont corporation doing business in New Hampshire through a chain of automotive dealerships called "Miller Auto Group."

4. Defendant David Cicotte (hereinafter, "Cicotte") is a principal in Performance, a manager of Miller Auto Group, and a key policymaker for Performance and Mechanics John Does 1-4.

5. Mechanics John Does 1-4 (hereinafter, "Does") are employees of Performance at Performance's "Miller Volkswagen-Dodge" dealership in Lebanon, New Hampshire. Mechanics John Does 1-4 performed work on Traudt's Dakota.

## JURISDICTION AND VENUE

6. Personal jurisdiction over defendant Daimler exists with this court in that Daimler advertises, sells, and services vehicles throughout all 50 US states. Daimler produced a Dakota vehicle at an assembly plant in Michigan. The Dakota was purchased by Traudt in New Hampshire and registered in Vermont. Defective Daimler Dakotas and Durangoes currently travel all 50 states.

7. Personal jurisdiction over defendant Performance exists in that Performance is a RICO organization, barred under federal law, and this court has original jurisdiction. Performance is a Vermont corporation.

8. Personal jurisdiction over defendant Cicotte exists in that Cicotte is operating a racketeering organization under federal law, derives substantial financial benefit from this operation together with and/or in concert with others, and - upon information and belief - lives in New Hampshire, though has extensive retail and corporate ties to Vermont through Performance, which is registered in Vermont.

9. Diversity of citizenship jurisdiction and personal jurisdiction is claimed over defendants Does. Upon information and belief, Does could be either New Hampshire or Vermont residents.

10. The amount in question is over $50,000.

11. The defective automotive products manufactured by Daimler pose a clear and present danger nationally not only to Traudt but to all drivers and passengers in Dakotas and Durangoes and to other motorists and pedestrians.

12. The United States District Court for the District of Vermont is the court of original jurisdiction in this matter by geography, choice of law, convenience, and citizenship of parties. Federal law - the Racketeer Influenced Corrupt Organization Act, 18 USCS 1861 et. seq. - demands federal venue along with 18 USCS 4, misprision of a felony, in that

Plaintiff Traudt alleges ongoing criminal activities, and has personal knowledge of same.

## FACTS

13. Daimler designs, manufactures, distributes, and markets Dakotas and Durangoes.

14. Traudt purchased a 2003 Dakota from Miller Volkswagen-Dodge subsidiary of Performance on February 2, 2003.

15. The state of Vermont has laws mandating that every new vehicle sold to its residents and registered within the state be sold with an implied warranty that states that the vehicle is safe and suitable for use in its intended usage.

16. Dodge division of Daimler advertises its truck line as durable and suitable for its intended usages.

17. There was an implied warranty, express manufacturers warranty, and extended warranty of 7 years or 70,000 miles on Traudt's Dakota.

18. Daimler has manufactured its Dakota and Durango vehicles with defective front end components called "ball joints."

19. Daimler has manufactured its Dakota and Durango vehicles with defective front end components called "rotors."

20. Daimler has manufactured its Dakota and Durango vehicles with defective fuel system components called "fuel pumps."

21. Daimler has manufactured its Dakota and Durango vehicles with multiple defects.

22. Traudt's Dakota has had defective front end components called ball joints in his vehicle.

23. Daimler's Miller Dodge dealership replaced virtually the entire front end of Traudt's Dakota after Traudt's visible inspection (after repeated severe front end vibration) revealed a completely destroyed right upper ball joint as attached to the upper control arm of Traudt's Dakota.

24. Miller Dodge did not inform Traudt that it had replace other front end components.

25. At least one Dodge dealership located in Central Vermont, a dealership that has been selling Dodge products for years, has reported multiple repair attempts ending in catastrophic, critical failure of front end components on Dakotas and Durangoes.

26. Traudt has had to replace the fuel pump on his Dakota three times.

27. Brake rotors on Traudt's Dakota were warped and out of manufacturer's specifications at approximately 8,000 miles.

28. Daimler has refused to repair the defective brakes on Traudt's vehicle within and without the parameters set clearly in the vehicle's 12,000 mile expressed warranty.

29. Traudt has had to replace the front right drive axle of his Dakota.

30. Traudt has had damage done to his Dakota by the Does while it was serviced at Miller Dodge. This damage includes a jammed and "shorted out" OBD-II onboard diagnostic computer, and dangerous electrical repairs done on the defective fuel pump in the Dakota owned by Traudt.

31. Repairs performed by Performance's Miller Dodge personnel and the Does were dangerous, not in keeping with the manufacturer's standard operating procedures, were negligent, and could have lead to a fire in the vehicles fuel system.

32. Product defects shut down the vehicle at a truck stop on December 25, 2003, causing Traudt and Traudt's wife to lose Christmas with family in Connecticut.

33. Miller Dodge and Performance's other automotive units have a history of shoddy work, overcharging, and negligence. More than 25 complaints exists against Performance's divisions and are on file with the New Hampshire Attorney General's office.

34. Cicotte has command and control over Performance policies, and knew or should have known that Does did defective work on Traudt's Dakota.

35. Cicotte has command and control over Performance policies, and knew or should have known that vehicles at Performance units were being sold as "used" when in fact they had been wrecks.

36. Cicotte has command and control over Performance policies, and knew or should have known that predatory sales techniques were being used at Performance dealerships, to include altering sales agreements and bad faith negotiations. Cicotte knew or should have known that Miller Dodge personnel (including "Bruce" and "Jeremy" et. al.), in early February 2003, were altering sales agreements with customers to the enrichment of Cicotte and Performance.

37. Cicotte has command and control over Performance policies, and knew or should have known that Dakotas and Durangoes were inherently defective and dangerous by the sheer volume of repairs and/or complaints received by drivers of Dakotas and Durangoes.

38. Daimler, Performance, and Cicotte owed the public a duty to insure that safe vehicles

be sold and put on the road throughout Vermont and New Hampshire. Daimler, Performance, and Cicotte acted with profound contempt for the lives of the North American public.

39. Performance is operated as a criminal enterprise as defined by the Racketeer Influenced Corrupt Organization Act (RICO) by Cicotte, routinely over billing residents of both states for repairs, selling defective new and salvaged vehicles, conspiring to defraud customers on car financing agreements, installing non-OEM parts in vehicles during the conduct of insurance repairs, conducting vehicle financing practices which are of such a high percentage that they constitute "loan sharking" as defined by federal RICO provisions.

40. Cicotte, by and through Performance, has conducted the criminal enterprises identified in #39, above, across state borders in New Hampshire and Vermont, has conducted the criminal enterprises referenced in #39, above, against residents of both New Hampshire and Vermont, and has used radio, television, and internet modes of transmission to facilitate his criminal enterprise across contiguous state borders.

41. Daimler has known, or should have known, about Cicotte's and Performance's activities. Daimler has been enriched by Cicotte's actions and Performance's actions.

42. Cicotte is a racketeer as defined by RICO.

43. Performance is a racketeering organization as defined by RICO.

44. Daimler has been aware of the defects in the Dakota/Durango front suspensions by way of computer traffic, mechanic's reports, dealer parts orders, and multiple complaints by driver's/ and/or owners. Daimler has refused to recall the vehicles in question and permanently repair the defects.

45. Daimler has been made aware by in-depth news investigations by both CBS News and CBS's investigative arm, "60 Minutes" that the Dakota/Durango line of Daimler vehicles is dangerous, defective and in need of a total, full-house recall of vehicles.

46. Cicotte has given instructions to staffers at Performance dealerships on how to "scam" people on auto financing through the use of inflated monthly payment schedules rendered to buyers at lowered "final" sales prices.

47. Cicotte has authorized the use of non-OEM parts in vehicles.

48. Staff turnover at Cicotte-managed dealerships is enormous. Former employees talked to by Traudt in preparation of this litigation say that business ethics played a huge factor in their decisions to leave employment there.

49. (a) The standard for quality control in complex mechanical systems is "ISO 9001"

and its subsequent standard "ISO 9002." (b) Daimler has issued orders to Daimler-affiliated dealerships to cease warranty related repairs on Traudt's Dakota, in particular: to not repair the left front axle which was reported defective at approximately 34,000 miles to two separate dealerships.

### Count 1: Gross Negligence

50. Facts 12 through 49 are incorporated here by reference.

51. Daimler has manufactured vehicles, and continues to manufacture vehicles in the Dakota/Durango line that pose a clear and present safety danger to driver's and other motorists. Daimler refuses to recall the vehicles. Daimler refuses to recall Traudt's vehicle.

52. Due to the well-documented and observed design defects in the Dakota/Durango line, Traudt cannot in good faith drive vehicle for fear that at some point the front wheels may fly off the vehicle or the fuel pump may fail or worse, be the source of an electrical fire on the vehicle.

53. Traudt is being denied the full use and enjoyment of his property.

54. Traudt currently is paying $436 a month for the privilege of having the automotive equivalent of a paperweight (by virtue of its current utility) sit useless in his driveway.

55. Because of Daimler's acts or omissions to act, Traudt has been damaged.

WHEREFORE, Traudt prays of this court an immediate and restraining order enjoining Daimler and ordering them to recall Traudt's Dakota and all Dakota/Durango vehicles to effect permanent and safe repairs using ISO 9001 certified products or better in the repair or replacement of all Dakota/Durango ball joints and associated suspension parts made unserviceable due to the inferior performance of the Dakota/Durango ball joints.

WHEREFORE, Traudt pays for compensatory damages in the form of two months of car payments, costs of this suit, attorney's fees, and punitive damages as the court and jury see fit.

### Count II: Breech of Implied Warranty

56. Facts 12 through 49 are incorporated here by reference.

57. Daimler has a simple duty to sell products safe for use in their intended, marketed purposes.

58. Traudt lives in Central Vermont, on back country roads.

59. Traudt purchased the Dakota he owns for use in Central Vermont.

60. Daimler advertises its vehicles as rugged, reliable, and dependable.

61. Traudt's Dakota has not been rugged (except on Traudt's wallet and patience), reliable, or dependable, and in fact cost Traudt and his wife Christmas with his family in 2003.

62. Traudt's Dakota's fuel system has been flawed since purchase.

63. The implied warranty of service for its intended use has been breached by Daimler.

64. Because of Daimler's acts or omissions to act, Traudt has been damaged.

WHEREFORE, Traudt prays of this court an order restraining and enjoining Daimler and ordering Daimler to recall all Dakota/Durango vehicles to effect replacement of inherently defective fuel pumps aboard all Dakota/Durango vehicles.

WHEREFORE, Traudt seeks compensatory damages in the form of two months car payments on the Dakota, costs of this suit, attorney's fees, and punitive damages as the court and jury see fit.

### Count III: Breech of Express Warranty

65. Facts 12 through 49 are incorporated here by reference.

66. Daimler owed a duty to Traudt to replace defective brake rotors Traudt first reported as being warped and declining in effectiveness at the Traudt Dakota's approximate 8000 mile mark.

67. Daimler owed Traudt a duty to replace the damaged item under the terms of the vehicles express warranty.

68. Because of Daimler's acts or omissions to act, Traudt has been damaged.

WHEREFORE, Traudt prays of this court an order restraining and enjoining Daimler and ordering Daimler to effect replacement of Traudt's front brakes.

WHEREFORE, Traudt seeks compensatory damages in the form of two months car payments on the Dakota, costs of this suit, attorney's fees, and punitive damages as the court and jury see fit.

### Count IV: Negligence

69. Facts 12 through 49 are incorporated here by reference.

70. John Does 1-4 are mechanics who have worked or currently work for Performance at Performance's New Hampshire dealerships. They are as yet unidentified.

71. Does 1-4 effected dangerous, irresponsible, and dangerously substandard repairs on Traudt's Dakota that put all vehicle occupants in jeopardy of an electrical fire or system failure.

72. The fuel system work performed by Does- 1-4 at various times in 2003 eventually in large measure cost Traudt Christmas Day, 2003.

73. Does 1-4 had a duty to act professionally and to effect repairs in a safe manner on Traudt's vehicle. They owed a duty to Traudt.

74. Because of Daimler's acts or omissions to act, Traudt has been damaged.

WHEREFORE, Traudt prays for compensatory damages in the form of $5000 to compensate for the loss of Christmas with his family.

## Count V: RICO/Performance

75. Facts 12 through 49 are incorporated here by reference.

76. Performance is a Vermont company doing business in New Hampshire. Performance continues to engage, and has engaged in, a pattern of racketeering activity.

77. Performance maximizes profits by avoiding compliance with state and federal laws.

78. Performance uses interstate modes of communications to facilitate its criminal enterprise.

79. As a proximate cause of Performance's acts and omissions to act in furtherance of RICO identified illegal activities, Traudt has been damaged.

WHEREFORE, Traudt prays for $1500 compensatory and punitive damages as the court and jury see fit, along with costs and reasonable attorney's fees.

## Count VI: RICO/Cicotte

80. Facts 12 through 49 are incorporated here by reference.

81. Cicotte is the mastermind and nexus of a RICO-identified illegal criminal enterprise.

82. Cicotte has been ripping off New Hampshire and Vermont people for years.

83. As a proximate cause of Cicotte's acts and omissions to act in furtherance of RICO identified illegal activities, Traudt has been damaged.

WHEREFORE, Traudt prays for compensatory damages in the amount of $1500, treble damages as provided for under RICO, that the Dakota's purchase price be refunded with interests and costs (in return for Traudt surrendering the title and ownership of the vehicle) and punitive damages in an amount as the jury and court see fit.

Traudt hereby demands a jury trial, reasonable attorney's fees, and any other relief this court deems necessary.

Traudt hereby requests an expedited hearing (for injunctive relief) once service of process is complete upon defendant Daimler based on the clear and present danger to Traudt and others posed by defects in Dakota/Durango vehicles.

_____
SCOTT TRAUDT
PRO SE
9 JUNE 2004

Scott Traudt
191 Kibling Hill Rd.
Strafford, VT
05072
802-889-9898
Email: Dolphin303@msn.com